IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CAZEIO REYNOLDS,   )
          )
   Plaintiff,    )
          )
v.         )  CIVIL CASE NO. 1:21-cv-649-ECM
          )     [WO]
TRAVIS CALHOUN, *et al.*,  )
          )
   Defendants.   )

**MEMORANDUM OPINION and ORDER**

**I.  INTRODUCTION**

This action arises out of a January 2020 traffic stop involving Plaintiff Cazeio Reynolds ("Reynolds"), which culminated in Reynolds being tased twice. Reynolds subsequently filed this suit in September 2021. (Doc. 1).[1] Two months later, Reynolds filed an amended complaint (the operative complaint), asserting seven causes of action against four of the officers in their individual capacities:  Defendants Travis Calhoun ("Calhoun"), Jonathan Elkins ("Elkins"), Brandon Chase Pynes ("Pynes"), and Damon Woodall ("Woodall") (collectively, the "Defendants"). (Doc. 12).

Following the resolution of the Defendants' motion to dismiss—three counts remain, all brought pursuant to 42 U.S.C. § 1983:  Count One, a Fourth Amendment excessive force claim against each of the Defendants; Count Five, a First Amendment retaliation claim against Calhoun; and Count Six, a supervisory liability claim against

---

[1] The Court refers to the document and page numbers generated by CM/ECF.

Elkins.  Now pending before the Court is the Defendants' motion for summary judgment. (Doc. 53).  The motion is fully briefed and ripe for review.  For the reasons that follow, the motion is due to be granted in part and denied in part.

## II.  JURISDICTION

The Court has subject matter jurisdiction over the federal law claims in this proceeding pursuant to 28 U.S.C. § 1331.  Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## III.  LEGAL STANDARD

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting FED. R. CIV. P. 56(a)).  "[A] court generally must 'view all evidence and make all reasonable inferences in favor of the party opposing summary judgment.'" *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016) (citation omitted).  However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018) (citation omitted).  If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); FED. R. CIV. P. 56(c).  The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.* at 1311.  The burden then shifts to the non-moving party "to establish, by going beyond the pleadings, that a genuine issue of material fact exists." *Id.* at 1311–12. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  Non-movants must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A) & (B).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the non-movant. *Fla. Int'l Univ. Bd. of Trs.*, 830 F.3d at 1252.  Likewise, the reviewing court must draw all justifiable inferences from the evidence in the non-moving party's favor. *Id.*  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).

## IV.  FACTS[2]

Reynolds and his wife, Kimberly Reynolds ("Kimberly"), hail from Henry County, Alabama, a rural county on the southeastern border of the state just north of Dothan.  On January 10, 2020, Kimberly drove from their current home near Atlanta, Georgia to Henry County to attend a funeral the next day.  Reynolds rode in the backseat next to the couple's one-year-old daughter.  At approximately 11:00 p.m., Kimberly noticed flashing police lights behind her.  As Kimberly continued driving, one of the police cars employed a box maneuver, a tactic in which two police cars surround a vehicle and slow down to get the vehicle to come to a halt.  After the box maneuver's deployment, Reynolds' vehicle and the two police cars all stopped on the right side of the road.

The three vehicles sat on the right side of the road facing the same direction.  Behind Reynolds' vehicle was a police car driven by Calhoun, a Corporal Deputy Sheriff, with Reserve Deputy Pynes in the passenger seat.  In front of Reynolds' vehicle was a police car[3] driven by Deputy Elkins, who was informally promoted to the position of Corporal,[4] and Reserve Deputy Woodall.  The traffic stop and subsequent arrest were captured by body cameras worn by Pynes and Elkins.[5]

---

[2] Since this case comes before the Court on the Defendants' motion for summary judgment, the Court construes the facts in the light most favorable to Reynolds, the non-movant.  Accordingly, the Court draws all justifiable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[3] Elkins initiated the box maneuver from this police vehicle.

[4] Elkins was formally promoted to Corporal on June 29, 2020.

[5] For clarity, and because the body camera footage was originally submitted with the Defendants' motion for summary judgment, citations to Pynes' body camera footage reference Exhibit 10 and citations to Elkins' body camera footage reference Exhibit 11.

Twenty-two seconds after Pynes turned on his body camera, Pynes and Calhoun exited their vehicle.  Calhoun can be heard making an unintelligible comment, followed by a quieter comment by Pynes that "they are fussing." (Ex. 10 at 00:27).  Pynes can be seen unholstering his firearm as Calhoun yelled for the occupants of Reynolds' vehicle to show him their hands.  Next, Pynes moved behind his open car door, his firearm aimed at Reynolds' vehicle.  Calhoun again yelled for the occupants to show their hands, this time adding "through the window." (*Id.* at 00:47–54).  Reynolds then asked what Calhoun wanted him to do.  Calhoun promptly responded that he "wants [Reynolds] to stick his hands out the window." (*Id.* at 00:57–59).  Before Calhoun finished his statement, Reynolds' hands can be seen outstretched from his backseat window, Calhoun responded, "thank you." (*Id.* at 1:00).

At this point, Reynolds' vehicle is briefly blocked from view in Pynes' body camera footage.  Calhoun asked the occupants of Reynolds' vehicle to stick their hands out of the window.  Calhoun then asked if anyone else is in the vehicle.  Reynolds responded loudly that his dad is Greg Reynolds ("Greg") and that he is headed to Greg's house.  Reynolds then tells Calhoun that Greg will be there in five minutes.  Calhoun tells Reynolds that he is "about to go to jail for disorderly conduct if" he does not "quit." (*Id.* at 1:27).  Reynolds repeated who his father is, and Calhoun cut him off, telling him he does not care.  Calhoun told Reynolds that "this is a traffic stop" and he "is going to act respectful." (*Id.* at 1:33).  Reynolds yelled back that he had done nothing, to which Calhoun yelled back that he was in the vehicle and the driver was getting pulled over, so he needed to "shut up please." (*Id.* at 1:41).  Reynolds told Calhoun not to tell him to shut up.  Calhoun responded that

Reynolds was making everything worse.  Pynes seemed to become alarmed that Reynolds had pulled his hands back into the vehicle, and Pynes briefly raised his firearm.

From 1:57 to 2:08, Calhoun and Pynes walked to Reynolds' vehicle with flashlights in hand, while Elkins and Woodall remained in their vehicle.  Kimberly can be heard speaking during this time.  Pynes, who approached on the passenger side, shined his light into the backseat and mentioned that the couple had a daughter in the car.  Calhoun's response is unintelligible.  Reynolds, with a raised voice, then told Calhoun that he did not know who he was either and repeats that his dad is Greg Reynolds.  Kimberly can be heard yelling something in the background.  Calhoun spoke over Reynolds and warned him that he is about to go to jail, to which Reynolds asked, "for what?" (*Id.* at 2:18).  Calhoun says for disorderly conduct—there are houses near them and Reynolds is yelling.  Kimberly can again be heard screaming louder.  Reynolds made another comment and Calhoun told him that he does not care where he is from.  Another police car arrived and parked next to Reynolds' vehicle in the opposite lane.  Officer Steven Culbreth ("Culbreth")[6] stepped out of his vehicle and stood beside Reynolds' car.

Kimberly can be heard wailing in the background as Calhoun, who remained positioned next to Reynolds' back door with his flashlight out, asked Kimberly for her driver license and insurance.  Reynolds made another unintelligible comment, noticeably quieter, to which Calhoun said "good" as Kimberly cried. (*Id.* at 2:33).  Reynolds made another comment, that he did not know who Calhoun was.  At this point, Calhoun

---

[6] Officer Culbreth is not a party in this action.

interrupted Reynolds and told him to get out of the car four times in quick succession. Reynolds did not comply.  Elkins and Woodall both exited their vehicle and moved toward Reynolds' vehicle.  Calhoun's hand rested on the backdoor handle of Reynolds' car. Woodall, who exited Elkins' vehicle and made his way around the passenger side of the car, came around from behind Pynes, who was still at the back right side of the vehicle. Elkins stood behind Calhoun.  Woodall put his taser up to the car window.  Kimberly can be heard pleading with Reynolds to stop.  As Pynes walked around the vehicle to check on Reynolds' daughter, Calhoun and other officers ordered Reynolds to get out of the car again and get on the ground.  Kimberly also yelled for him to get on the ground.

Reynolds then exited the car and placed both feet on the roadway.  After he exited his car, Reynolds' right knee began to bend, as if to start to kneel.  Before Reynolds moved any further, Woodall tased Reynolds.  At 2:51 of Pynes' body camera footage, Reynolds fell to the ground and screamed.  Kimberly exclaimed that the officers "do not have to do all that." (*Id.* at 2:56).  Four officers surrounded Reynolds on the ground:  Calhoun at his right shoulder, Elkins at his right arm, Culbreth at his left shoulder/arm, and Woodall on the left side of his legs.  Pynes, standing a few feet away from Reynolds on the vehicle's driver side, watched with his flashlight illuminated.  Reynolds remained on the ground when Woodall tased Reynolds a second time.  When Woodall deployed his taser the second time, four officers—Woodall, Calhoun, Elkins, and Culbreth—surrounded Reynolds and were holding on to parts of his body.  Woodall then used his arms and twisted Reynolds' ankles and pulled Reynolds' leg back.  Pynes asked Kimberly, who was screaming at all the officers while Reynolds was on the roadway, to calm down.  Reynolds can be heard

7

telling the officers that he has a bad ankle.  The officers handcuffed Reynolds as Calhoun chastised him for "waking all these people up at night for no reason." (*Id.* at 3:24).  Calhoun filed a criminal complaint for disorderly conduct against Reynolds; Kimberly received only a traffic warning.

## V.  DISCUSSION

The Defendants move for summary judgment on Reynolds' three remaining claims: (1) a Fourth Amendment excessive force claim against each of the Defendants; (2) a supervisory liability claim against Elkins; and (3) a First Amendment retaliatory arrest claim against Calhoun.  Reynolds contends that the Defendants deprived him of his Fourth Amendment right to be free from the use of excessive force during an arrest and his First Amendment right to be free from retaliation against protected speech.

The Defendants contend they are entitled to qualified immunity from Reynolds' § 1983 claims.[7]  Qualified immunity protects government officials from suit when they are "performing discretionary functions" and "their conduct does not violate clearly established constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To determine whether qualified immunity is appropriate, the Court first must determine whether the Defendants were acting within the scope of their discretionary authority. *See Ingram v. Kubik*, 30 F.4th 1241, 1250 (11th Cir. 2022).  The parties do not dispute that conducting traffic stops and arrests were within the

---

[7] Reynolds argues at length that the doctrine of qualified immunity should be abolished. (*See generally* doc. 62 at 20–38).  But as Reynolds acknowledges, this Court cannot overrule Supreme Court or Eleventh Circuit precedent holding that qualified immunity is an affirmative defense to individual capacity § 1983 claims for damages.

scope of the Defendants' discretionary authority.  Because the Defendants performed discretionary functions, Reynolds must next demonstrate that the Defendants (1) "violated [his] constitutional right[s]," and that (2) his constitutional rights "w[ere] clearly established at the time of the alleged violation." *See id.*

## A.      Fourth Amendment Excessive Force

Reynolds brings an excessive force claim against all the Defendants.  His claim is "grounded in the Fourth Amendment's prohibition on 'unreasonable searches and seizures.'" *Richmond v. Badia,* 47 F.4th 1172, 1180 (11th Cir. 2022) (quoting U.S. Const. amend. IV); *see also Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009) (explaining that the Fourth Amendment encompasses "the right to be free from excessive force during the course of a criminal apprehension").  Reynolds must first establish that the Defendants violated his constitutional right to be free from excessive force during his arrest.

To determine whether any of the Defendants committed a constitutional violation, the Court must evaluate whether the force used by the officers was reasonable. *Graham v. Connor*, 490 U.S. 386, 395 (excessive force claims are "analyzed under the Fourth Amendment and its 'reasonableness' standard.").  Whether the force used to effectuate Reynolds' arrest was reasonable "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).  The Court must consider whether the force applied was "'objectively reasonable in light of the facts confronting the officer,' a determination [this Court] make[s] 'from the perspective of a reasonable officer on the scene,' and not 'with the 20/20 vision of

hindsight.'" *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015).

The Supreme Court outlined several factors courts must consider when determining whether an officer used excessive force during an arrest, including: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Additional factors include "the justification for the application of force, the relationship between the justification and the amount of force used, and the extent of any injury inflicted." *Richmond*, 47 F.4th at 1182.

Importantly, however, the existence of probable cause does not resolve an excessive force claim. *Id.* at 1180. Rather, a "genuine 'excessive force' claim relates to the manner in which an arrest was carried out, independent of whether law enforcement had the power to arrest." *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). Therefore, a finding that Calhoun had probable cause to arrest Reynolds for disorderly conduct, while relevant, is not dispositive in this Court's evaluation of Reynolds' excessive force claim.

Even when "an officer has probable cause for an arrest, 'the manner in which a search or seizure is conducted' must nonetheless comply with the Fourth Amendment." *Richmond*, 47 F.4th at 1180 (quoting *Garner*, 471 U.S. at 7–8). And "[t]o receive qualified immunity, an officer need not have actual probable cause, but only 'arguable' probable cause." *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010). "Arguable probable cause exists where 'reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to

arrest a [p]laintiff.'" *Id.* (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004)).  "Whether an officer possesses probable cause or arguable probable cause depends on the elements of the alleged crime and the operative fact pattern." *Id.* at 735. The Court begins its inquiry, therefore, with the question of whether Calhoun had at least arguable probable cause to arrest Reynolds for disorderly conduct.  As explained below, the Court finds that Calhoun had arguable probable cause to make this arrest.

The Court begins with the relevant statutory text.  Alabama law defines disorderly conduct as occurring when a person, "with intent to cause public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof," takes one of six actions, such as engaging "in violent tumultuous" behavior, making "unreasonable noise," or using "abusive or obscene language." *See* ALA. CODE § 13A-11-7.  Disorderly conduct is a "Class C misdemeanor." *Id.* at § 13A-11-7(b).  Reynolds was arrested for allegedly violating subsection (a)(2), making unreasonable noise.  But merely making loud noise is not enough to violate the law; the noise must be unreasonable under the circumstances. *Lambert v. Herrington*, 2022 WL 2345769, at *5 (11th Cir. 2022) (citing *Swann v. City of Huntsville*, 455 So. 2d 944, 950 (Ala. Crim. App. 1984)).

On this record, the Defendants had arguable probable cause to arrest Reynolds for disorderly conduct, that is, the Defendants could reasonably have believed that Reynolds' conduct violated Alabama's disorderly conduct statute.  Reynolds concedes he spoke to the Defendants "in a raised voice." (Doc. 62 at 49).  The relevant interpretive question for the Court is whether reasonable officers "in the same circumstances and possessing the same

knowledge as the Defendants could have believed that probable cause existed to arrest" Reynolds for disorderly conduct.  *See Brown*, 608 F.3d at 734.

The evidence, even when viewed in the light most favorable to Reynolds, demonstrates that after the officers stopped Reynolds' vehicle, Reynolds rolled his window down, in a residential area, late at night, and yelled back and forth with Calhoun.  Reynolds admittedly spoke in a "raised voice" with Defendants. (Doc. 62 at 49).  Defendants communicated with and understood Reynolds, despite being separated by over 200 feet. (*Id.* at 50–51).  The Eleventh Circuit has held that speaking in a raised tone, under the right circumstances, can be unreasonable.  In *Redd v. City of Enterprise*, the Eleventh Circuit held that officers had arguable probable cause to arrest a plaintiff for disorderly conduct who "attempt[ed] to be heard over the traffic at [an] intersection." 140 F.3d 1378, 1382–83.  There, the plaintiff admittedly spoke "loudly enough to be heard across a busy intersection" and his admission that he spoke loudly was "sufficient to establish that the officers had arguable probable cause to arrest." *Id.* at 1382 n.4.

Here, Reynolds admittedly spoke in a raised tone, in a residential area, late at night—and yelled loudly enough to be heard over 200 feet away.  On this evidence, the Defendants could have reasonably believed that Reynolds violated the disorderly conduct statute, even if these circumstances were insufficient to prove an actual violation of § 13-A-11-7(a)(2).  *See Brown*, 608 F.3d at 736.  The Defendants are entitled to qualified immunity, even when, "in hindsight . . . [an officer] might have made a mistake." *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018).

Therefore, the Defendants had arguable probable cause to arrest Reynolds because the Defendants could reasonably have believed that Reynolds violated Alabama's disorderly conduct statute.

The Court will now analyze the excessive force claim as to each Defendant, beginning with Woodall.

### 1.   *Woodall*

#### a.   **Constitutional Violation**

Woodall applied force to Reynolds on three separate occasions:  the first tase, the second tase, and twisting Reynolds' ankle.  Viewing the evidence and all reasonable inferences in Reynolds' favor, a reasonable jury could conclude that Woodall's first and second tases were excessive uses of force.  The Court evaluates the three instances Woodall applied force to Reynolds, considering the *Graham* factors.

##### i.   **First Tase**

After the initial traffic stop, the Defendants and Reynolds shouted back and forth from a safe distance.  Reynolds placed his hands out of his window, in compliance with Pynes' directive.  Later, Reynolds placed his hands back into his vehicle, and Calhoun and Pynes approached Reynolds' vehicle with flashlights in hand.  Calhoun warned Reynolds that he may go to jail for disorderly conduct.  Calhoun and other officers directed Reynolds to exit his vehicle and get on the ground.  Reynolds did not immediately comply with the officers' directives to exit his vehicle.  Only after officers repeatedly requested Reynolds to exit his vehicle, Reynolds got out of the car and placed both feet on the roadway.  Reynolds, now in the roadway, was repeatedly told to get on the ground.  Although initially

non-compliant, Reynolds eventually began to bend his right knee, as if to start to kneel when Woodall tased him.

First, Reynolds was arrested for disorderly conduct, a low-level criminal offense. *Accord Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011) ("Disorderly conduct is not a serious offense."). Second, a reasonable jury could conclude that Reynolds was not fleeing or evading arrest. Although the Defendants claim that Reynolds attempted to pull his arm away from Woodall as he exited his vehicle, the body camera footage does not conclusively support that assertion, and thus a reasonable jury could reject it and conclude that Reynolds was not evading arrest. Thus, the first two *Graham* factors weigh in Reynolds' favor. Third, a reasonable jury could find that Reynolds did not pose an immediate threat to the officers or bystanders. The Court acknowledges the Defendants' testimony that, upon hearing screaming at the initiation of the traffic stop, they believed that a domestic disturbance might be occurring within Reynolds' vehicle. However, because the case is here on summary judgment, a reasonable jury could find that any concern about the perceived domestic disturbance had abated. Viewing the evidence in the light most favorable to Reynolds, when Woodall tased Reynolds the first time, Reynolds appears to begin to comply with the officers' orders. Multiple officers then surrounded Reynolds. A reasonable jury could find that any potential threat was mitigated by the multiple officers' use of force to restrain Reynolds. Consequently, the third factor also weighs in Reynolds' favor at this stage.

Because, viewing the evidence in Reynolds' favor, Reynolds was becoming compliant, and was surrounded by officers, the need to apply force was minimal. *See*

14

*Richmond*, 47 F.4th at 1182.  And although "a taser is generally not a deadly weapon," *Bradley v. Benton*, 10 F.4th 1232, 1241 (11th Cir. 2021), it does administer an electronic shock in order to "incapacitate a suspect." *Fils*, 647 F.3d at 1276 n.2.  Thus, at this stage and on this record, the amount of force used outweighed the need for force. *See Richmond*, 47 F.4th at 1182.  The sole factor weighing against Reynolds' first tase constituting excessive force is the extent of the injury inflicted.  Reynolds does not claim that he suffered long term harm or argue that he endured extreme suffering.  However, on this record, this factor does not outweigh the others.

The Defendants cite *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004), to support their argument that Woodall's use of a taser on Reynolds was justified.[8]  In *Draper*, a single sheriff conducted a routine traffic stop late at night. *Id.* at 1272.  After having the plaintiff step out of the truck cabin, the plaintiff became "hostile, belligerent, and uncooperative." *Id.* at 1278.  The sheriff asked the plaintiff to retrieve documents from his truck cabin five times and each time the plaintiff refused to comply. *Id.* at 1276.  He also "used profanity, moved around and paced in agitation, and repeatedly yelled." *Id.* at 1278.  The situation was "difficult, tense, and uncertain," requiring a "reasonable need for some use of force" to effectuate the arrest. *Id.*  Moreover, the shock from the taser "may well have prevented a physical struggle and serious harm to either" the sheriff or the plaintiff. *Id.*

---

[8] The Defendants argue *Draper* supports Woodall's first and second uses of his taser. (Doc. 55 at 25–26).

Reynolds' situation differs from the facts outlined in *Draper*.  First, there was one officer at the scene in *Draper*, whereas five officers were at the scene of Reynolds' arrest. *Cf. Charles v. Johnson*, 18 F.4th 686, 700 (11th Cir. 2021) (concluding that deputy did not use excessive force where, among other circumstances, the deputy "had no backup on the scene").  Second, in *Draper*, the plaintiff "paced in agitation" and "used profanity." 369 F.3d at 1278.  Although Reynolds raised his voice, and was at time, non-compliant, he ultimately complied with officers' instructions and exited the vehicle.  While Reynolds appeared angry during the traffic stop, a reasonable jury could find that Reynolds was not so "belligerent" that the tase was appropriate. *Id.*  Finally, and most importantly, a reasonable jury could conclude that when Reynolds was ordered to get on the ground after exiting his vehicle, Reynolds had started to comply when Woodall tased him.  Thus, an officer in Woodall's position would have not reasonably perceived that Reynolds was refusing to comply with orders when he was tased.

Accordingly, Reynolds has established that a reasonable jury could conclude that Woodall's first tase constituted excessive force.  Therefore, Woodall is not entitled to qualified immunity for tasing Reynolds in the first instance.

### ii.    Second Tase

A reasonable jury could also conclude that Woodall used excessive force when he tased Reynolds the second time.  When Woodall tased Reynolds the second time, Reynolds was on the ground, and surrounded by or being restrained by at least four officers.  First, a reasonable jury could conclude that Reynolds was not fleeing or evading arrest before Woodall tased Reynolds for the second time.  Reynolds had been tased approximately ten

seconds earlier, and four officers were holding Reynolds down.  The Defendants contend that Reynolds was resisting arrest after the first tase, necessitating the use of additional force.  However, the body camera footage does not conclusively support the Defendants' position, and thus a reasonable jury could reject it and find that Reynolds was not resisting.

Additionally, a reasonable jury could find that Reynolds did not pose an immediate threat to the officers or bystanders.  Reynolds was on the ground and surrounded or held down by at least four officers.  A reasonable jury could conclude that Reynolds posed even less of a threat when he was tased the second time because he was on the ground and surrounded or held down by at least four officers.  For similar reasons explained regarding the first tase, the need to administer the second tase was minimal given that Reynolds was being held down on the ground by multiple officers.  Moreover, at this stage and on this record, the force employed by the second tase far outweighed the need for force.  *See Richmond*, 47 F.4th at 1182.  The sole factor weighing against Reynolds' second tase constituting excessive force is the extent of the injury inflicted, which Reynolds does not claim was severe or long-lasting.  However, on this record, this factor does not outweigh the others.

The Defendants again cite *Draper* to support their argument that Woodall's second use of a taser on Reynolds was justified.  For the reasons stated above, Reynolds' situation differs from the facts outlined in *Draper*.  Here, objectively reasonable officers in Woodall's position would not have believed that they could have tased Reynolds for the second time after he was being restrained on the ground.  Accordingly, Reynolds has established that a reasonable jury could conclude that Woodall's second tase constituted

excessive force.  Therefore, Woodall is not entitled to qualified immunity for tasing Reynolds—a second time.

### iii.    Ankle Twist

After the second tase, Woodall grabbed and twisted Reynolds' ankles while Elkins was handcuffing Reynolds.  At this point, Woodall was assisting in effectuating Reynolds' arrest and aiding Elkins' attempt to handcuff Reynolds.  An officer in Woodall's position can use permissible force to complete an arrest even if the arrest involved a minor offense—disorderly conduct.   Woodall was permitted to use "physical restraint" to effectuate Reynolds' arrest. *Brown*, 608 F.3d at 740.  The Eleventh Circuit has held that officers using a leg restraint to effectuate a suspect's arrest—even when the leg restraint "may not have been entirely necessary[,]" were entitled to qualified immunity. *See Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1290-92 (11th Cir. 2009).  Here, Woodall grabbed Reynolds' ankles to aid Elkins' attempt to handcuff Reynolds and effectuate his arrest.

Because Woodall had arguable probable cause to arrest Reynolds for disorderly conduct, he was permitted physically restrain Reynolds to effectuate the arrest.  Reynolds has not alleged that he suffered long term effects from this use of force, and no reasonable jury could conclude that Woodall grabbing and twisting Reynolds constituted excessive force.

### b.    Clearly Established

Having established that Reynolds has adequately shown a violation of his Fourth Amendment Rights, the Court must next determine whether this constitutional right was

clearly established in January 2020 when these events occurred.  *See Patel v. Lanier Cnty.*, 969 F.3d 1173, 1181 (11th Cir. 2020).  A right is clearly established when "the state of the law g[ives] the [defendants] fair warning that their alleged conduct [is] unconstitutional." *Id.* at 1186 (quoting *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1102 (11th Cir. 2014)).  To start, the Court must resist "defin[ing] clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).  Reynolds can demonstrate that the law was clearly established in one of three ways:  he can (1) point to a materially similar decision of the United States Supreme Court, the Eleventh Circuit, or the Alabama Supreme Court; (2) establish that "a broader, clearly established principle should govern the novel facts of the situation[;]" or (3) show "that the conduct at issue so obviously violated the Constitution that prior case law is unnecessary." *See Patel*, 969 F.3d at 1186.

Based on the record and the evidence presented at this stage, the Court finds that, in January 2020, it was clearly established law that the Fourth Amendment forbids police officers from tasing a restrained suspect accused of committing misdemeanor disorderly conduct.  In *Stryker v. City of Homewood*, the Eleventh Circuit acknowledged its 2011 holding in *Fils*, in which the court "explicitly held—and thus clearly established—that employing a taser on a compliant, nonthreatening suspect violates the Constitution." 978 F.3d 769, 775 (11th Cir. 2020) (citing *Fils*, 647 F.3d at 1288–89).  "Of course, the use of tasers or other weapons does not violate the Fourth Amendment *per se*." *Fils*, 647 F.3d at 1289.  "Such force could be appropriate where an officer reasonably believes the suspect is violent." *Id.*  But, viewing the evidence in the light most favorable to Reynolds, Woodall tased Reynolds as he was attempting to comply with officers' instructions and then tased

Reynolds again when he was lying on the ground being restrained by multiple officers. Therefore, construing the evidence in the light most favorable to Reynolds, he has established that Woodall violated his clearly established constitutional right to be free from excessive force.

### 2.    *Calhoun and Pynes*

Before analyzing Reynolds' excessive force claims against Calhoun, Elkins, and Pynes, the Court addresses a threshold issue. Reynolds' response indicates that, while he pursues an excessive force claim against these officers for their use of physical force against him (including the taser), he also pursues liability based on their failure to intervene with Woodall's use of force. The Defendants, on reply, argue that Reynolds "did not plead and has never pled a failure-to-intervene claim." (Doc. 63 at 4). The Defendants are incorrect.[9] Thus, the Court will analyze Reynolds' claim that Calhoun, Elkins, and Pynes failed to intervene in Woodall's use of excessive force.

### a.    **Constitutional Violation**

Reynolds alleges that Calhoun, Elkins, and Pynes failed to intervene as Woodall subjected him to excessive force. Because Reynolds sues Elkins under a theory of

---

[9] The Defendants are incorrect for two reasons. First, Reynolds did plead a claim based on the officers' failure to intervene. Paragraph ninety-five of his amended complaint alleges that "Calhoun, Elkins, and Pynes stood by idly, failing to take reasonable available steps to halt this use of excessive force, even though they knew or should have known that their fellow deputy was violating Reynolds' rights." (Doc. 12 at 11). This language tracks the language used by the Eleventh Circuit when discussing a failure to intervene claim. *See Crenshaw v. Lister*, 556 F.3d 1283, 1293–94 (11th Cir. 2009) ("An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." (quoting *Hadley*, 526 F.3d at 1330)). Second, the Court recognized as much in its memorandum opinion and order on the Defendants' motion to dismiss. (Doc. 25 at 8 n.5) ("[Reynolds] identifies the specific Defendants present at the arrest and that each participated by either pinning him to the ground, tasing him, or failing to intervene.").

supervisory liability, the analysis of this claim against Elkins—which the Eleventh Circuit refers to as a "failure to stop" claim—differs slightly. *See, e.g.*, *Keating v. City of Miami*, 598 F.3d 753, 765 (11th Cir. 2010) ("The difference between a direct failure to intervene claim and a failure to stop claim under a theory of supervisory liability lies in the position and authority of the defendant with respect to the person who commits the constitutional violation."). Consequently, the Court will first analyze the failure to intervene claim with respect to Calhoun, Elkins, and Pynes before turning to the supervisory liability claim against Elkins.

"[A]n officer can be liable for failing to intervene when another officer uses excessive force." *Baker v. City of Madison*, 67 F.4th 1268, 1281 (11th Cir. 2023) (alteration in original) (quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 924 (11th Cir. 2000)); *see also Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998) ("[I]t is clear that '[i]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983.'" (second alteration in original) (citation omitted)). "Specifically, 'an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force[] can be held liable for his nonfeasance.'" *Baker*, 67 F.4th at 1281 (alteration in original) (quoting *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2007)). Liability for failure to intervene only arises when an officer is "in a position to intervene and fails to do so." *Priester*, 208 F.3d at 924.

For the reasons explained above in Section A.1, Reynolds has established a triable claim that Woodall violated his clearly established rights to be free from excessive force. Thus, the Court turns to whether Calhoun, Elkins, and Pynes were in position to intervene and failed to take reasonable steps to protect Reynolds from the use of excessive force.

Police officers, like Calhoun, Elkins, and Pynes "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Corbitt v. Vickers*, 929 F.3d 1304, 1321 (11th Cir. 2019) (quoting *Graham*, 490 U.S. at 396–97). "No binding authority requires officers to engage in extraordinary feats of action, reaction, speed, and movement." *Jackson v. City of Atlanta*, 97 F.4th 1343, 1363 (11th Cir. Apr. 5, 2024). Police officers are "often hampered by incomplete information and forced to make . . . split-second decision[s] between action and inaction." *Id.* (quoting *Davis v. City of Apopka*, 78 F.4th 1326, 1335 (11th Cir. 2023)).

Here, the evidence, even when viewed in the light most favorable to Reynolds, establishes that Calhoun, Elkins, and Pynes were not reasonably in a position to intervene against Woodall's use of excessive force. First, each time Woodall tased Reynolds, he did so without warning. The body camera footage provides no evidence that Woodall verbally or otherwise notified Calhoun, Elkins, or Pynes that he intended to tase Reynolds. Calhoun, Elkins, and Pynes were in no position to "anticipate[] and then stop[]" Woodall's use of force. *See Hadley*, 526 F.3d at 1331.

Woodall's use of excessive force happened quickly and ended quickly. The body camera footage demonstrates that Reynolds stepped out of his car, was tased, hit the ground, and tased for a second time—all within approximately ten seconds. (Ex. 11 at 1:23–

1:33).  "Instances of force that occur within seconds do not place officers in a realistic position to intervene." *Johnson v. White*, 725 F. App'x. 868, 878 (11th Cir. 2018) (per curiam).[10]  Under Reynolds' theory, Calhoun, Elkins, and Pynes are not entitled to qualified immunity because they failed—during a ten second period to (1) assess the amount of force Woodall was using on Reynolds; (2) make a determination on whether it was too much force in view of all the circumstances; and (3) if they decided it was excessive, decide how they should intervene, and then intervene in an appropriate and reasonable manner. *See Jackson*, 97 F.4th at 1363.  It would be unreasonable to require Calhoun, Elkins, and Pynes to "think and move that quickly in a difficult and fast-evolving situation that is fraught with uncertainty and peril." *Id.*  Because the events surrounding Reynolds' arrest, "occur[red] so quickly" Calhoun, Elkins, and Pynes were not in a position to intervene and are thus not liable for Woodall's constitutional violation. *See Fils*, 647 F.3d at 1290 n. 21.

Because the Court concludes that Calhoun, Elkins, and Pynes did not fail to intervene in Reynolds' arrest, there were no constitutional violations.  The Court concludes that Calhoun, Elkins, and Pynes are entitled to qualified immunity on Reynolds' failure to intervene claim.[11]

## B.    Supervisory Liability

Reynolds asserts a § 1983 claim against Elkins for supervisory liability.  In his view, Elkins failed to stop Woodall—who Elkins oversaw—from using excessive force against

---

[10] While the Court recognizes that *Johnson* is an unpublished opinion, the Court finds its analysis to be persuasive.

[11] Because the Court determines that no constitutional violations occurred, it pretermits discussion regarding whether the law was clearly established.

Reynolds by tasing him twice.  Elkins asserts the defense of qualified immunity.  He also argues, on reply, that Reynolds conflates a failure to stop claim with a failure to intervene claim.   Reynolds  must  next  demonstrate  the  Defendants  (1)  "violated  [Reynolds']  constitutional right," and (2) the constitutional right "was clearly established at the time of the alleged violation." *Ingram*, 30 F.4th at 1250.

### 3.  *Elkins*

#### a.  **Constitutional Violation**

The  Court  considers  the  first  prong  of  qualified  immunity,  whether  Elkins  committed  a  constitutional  violation.  As  an  initial  matter,  the  "standard  by  which  a  supervisor  is  held  liable  in  [his]  individual  capacity  for  the  actions  of  a  subordinate  is  extremely rigorous." *Danley v. Allen*, 540 F.3d 1298, 1314 (11th Cir. 2008) (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003)).   Section 1983 claims against supervisory officials cannot rest on vicarious liability or *respondeat superior*. *Keating*, 598 F.3d at 762.  Rather, supervisors may be liable under § 1983 "either when the supervisor personally  participates  in  the  alleged  constitutional  violation  or  when  there  is  a  causal  connection  between  actions  of  the  supervising  official  and  the  alleged  constitutional  violation." *Id.* (quoting *Gonzalez*, 325 F.3d at 1234).

#### i.  **Elkins' Personal Participation in the Constitutional Violation**

The  Court  first  considers  whether  Elkins  personally  participated  in  the  alleged  constitutional violation, Reynolds' tasing.  The parties do not dispute that Elkins, an acting Corporal at the time of Reynolds' arrest, supervised Woodall, a lower ranking officer.

Woodall alone deployed the taser against Reynolds.  Elkins facilitated Reynolds' arrest by attempting to pin Reynolds' arms behind his back as Calhoun and Elkins tried to handcuff Reynolds.  Elkins used permissible force in effectuating Reynolds' arrest.  "For even minor offenses, permissible force includes physical restraint, use of handcuffs, and pushing into walls." *Brown*, 608 F.3d at 740.  Additionally, "[l]ifting an arrestee's arm behind his back in order to handcuff him is a routine arrest technique." *Sebastian v. Ortiz*, 918 F.3d 1301, 1311 (11th Cir. 2019).  Because Elkins did not personally tase Reynolds, and used permissible force to effectuate Reynolds' arrest, Elkins cannot be held liable as a supervisor under a theory that Elkins personally participated in any unconstitutional conduct—Reynolds' tasing.

### ii. Causal Connection Between Elkins' Actions and the Constitutional Violation

The Court next considers whether there is a causal connection between Elkins' actions and the alleged constitutional violation.  Here, Reynolds can establish a causal connection if the record "support[s] an inference that [Elkins] directed [Woodall] to act unlawfully or knew [Woodall] would act unlawfully and failed to stop [him] from doing so." *Keating*, 598 F.3d at 762 (quoting *Gonzalez*, 325 F.3d at 1234).

Reynolds can also establish a causal connection between Elkins' actions and the constitutional violation if Elkins, as Woodall's supervisor, "(1) ha[d] the ability to prevent or discontinue a known constitutional violation by exercising his or her authority over the subordinate who commits the constitutional violation, and (2) subsequently fail[ed] to exercise that authority to stop it." *Id.* at 765.  "The difference between a direct failure to

intervene claim and a failure to stop claim under a theory of supervisory liability lies in the position and authority of the defendant with respect to the person who commits the constitutional violation." *Id.*

Elkins did not direct Woodall to act unlawfully.  Reynolds points to no record evidence to suggest that Elkins directed or ordered Woodall to tase Reynolds.  Viewing the body camera footage in the light most favorable to Reynolds, there is no evidence to support an inference that Elkins directed Woodall to deploy his taser against Reynolds.  Therefore, Reynolds fails to establish a causal connection under this theory.  The record also does not support a finding that Elkins knew Woodall would act unlawfully and failed to stop him from doing so.  Reynolds points to no evidence that Woodall had a history of using excessive force of which Elkins was aware and the evidence does not suggest that Woodall "engaged in a history of widespread abuse such that [Elkins] would [have] been on notice of the need to take corrective action." *See Christmas v. Harris County*, 51 F.4th 1348, 1355 (11th Cir. 2022).

Reynolds argues that Elkins "had multiple opportunities to stop Woodall" and that Elkins could have anticipated Woodall's second tasing of Reynolds. (Doc. 62 at 58). Because the difference between Reynolds' failure to intervene claim discussed in Section A.2.a, and Reynolds' supervisory liability claim is Elkins' position and authority as Woodall's supervisor, the Court uses its previous analysis to inform its understanding of Reynolds' supervisory liability claim.

In *Keating*, the Eleventh Circuit held that supervisory officers who had "the authority[] and exercised that authority to direct . . . subordinate officers to engage in

unlawful acts" and failed to stop that conduct, satisfied the requisite causal connection between the supervisors' actions and corresponding constitutional violations. *Id.* at 765–67.  Here, although Elkins served in a supervisory role, Elkins did not have the ability to prevent Woodall's use of excessive force.  Despite his formal authority, the record evidence shows, even when viewed in the light most favorable to Reynolds, that Elkins did not have the ability to anticipate, prevent, or discontinue Woodall's tasing.  The record evidence shows that this was a rapidly-evolving situation peppered with limited reaction time. Elkins did not exercise his authority to direct Woodall to tase Reynolds.  And although Reynolds describes the events surrounding his arrest as "prolonged" (doc. 62 at 58) the evidence shows that the arrest and tasing occurred rather quickly.

Both times Woodall tased Reynolds, he did so without warning.  The body camera footage provides no evidence that Woodall verbally or otherwise notified Elkins that he intended to tase Reynolds.  During the approximately ten second period between Woodall's first and second tases, Elkins was actively engaged in effectuating Reynolds' arrest by securing and attempting to handcuff Reynolds.  The record evidence shows that Elkins did not command or otherwise use his supervisory authority to direct Woodall's taser use. Because Elkins did not have the ability to prevent Woodall's use of excessive force in the ten second interval while Elkins was effectuating Reynolds' arrest, Reynolds has failed to establish the requisite causal connection required for a supervisory liability claim.  Thus, Elkins is entitled to qualified immunity on Reynolds' supervisory liability claim.[12]

---

[12] Because the Court determines that no constitutional violation occurred, it pretermits discussion regarding whether the law was clearly established.

27

C.    **First Amendment Retaliation**

Reynolds claims that Calhoun violated his First Amendment rights by arresting him in retaliation for engaging in constitutionally protected speech.  Calhoun argues that he is entitled to qualified immunity because he had arguable probable cause to arrest Reynolds for disorderly conduct which, according to Calhoun, defeats Reynolds' First Amendment retaliatory arrest claim.  The Court analyzes whether Calhoun's conduct violated Reynolds' First Amendment right to be free from retaliation against protected speech.

a.        **Constitutional Violation**

"Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.  The First Amendment "protects not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1288 (11th Cir. 2019) (citation omitted). The Amendment "applies to the states through incorporation by the Due Process Clause of the Fourteenth Amendment." *Turner v. Williams*, 65 F.4th 564, 579 (11th Cir. 2023) (citing *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 707 (1931)).  To prevail on his retaliation claim, Reynolds must show:  (1) he engaged in protected speech; (2) Calhoun's retaliatory conduct adversely affected his protected speech; and (3) a causal connection exists between the retaliatory conduct and the adverse effect on the protected speech. *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).

"[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill*, 482 U.S. 451, 461 (1987). Reynolds had the right to verbally "oppose or challenge police action without thereby

risking arrest." *Id.* at 463.  Viewing the evidence and all reasonable inferences in his favor, a reasonable jury could conclude that Reynolds's speech was constitutionally protected because he did not use fighting words or engage in other forms of speech that are unprotected by the First Amendment.  Therefore, Reynolds satisfies the first *Bennett* element to prevail on his retaliatory arrest claim.

An arrest "would likely deter a person of ordinary firmness from the exercise of First Amendment rights[,]" *DeMartini*, 942 F.3d at 1289 n.8 (citation omitted), and Calhoun does not argue otherwise.  Thus, a reasonable jury could also conclude that Calhoun's conduct "adverse[ly] affected" Reynolds' exercise of his First Amendment rights. *Bennett*, 423 F.3d at 1250.  Therefore, Reynolds satisfies the second *Bennett* element to prevail on his retaliatory arrest claim.

If a plaintiff claims that "the governmental defendant has utilized the legal system to arrest or prosecute the plaintiff," then courts "require the plaintiff to plead and prove an absence of probable cause as to the challenged retaliatory arrest or prosecution" to meet the third *Bennett* element, causal connection. *Id.* at 1289 (citing *Nieves v. Bartlett*, 587 U.S. 391, 405 (2019)).  The absence of probable cause generally "provide[s] weighty evidence that the officer's animus caused the arrest, whereas the presence of probable cause will suggest the opposite." *Nieves*, 587 U.S. at 402.

In *Nieves*, the Supreme Court held, as a general rule, that a plaintiff bringing a First Amendment retaliatory arrest claim "must plead and prove the absence of probable cause for the arrest." *Id.*  The Supreme Court also articulated a narrow exception to that rule.  The presence of probable cause does not defeat a plaintiff's claim if he produces "objective

evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* at 407. The *Nieves* exception, "account[s] for 'circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so.'" *Gonzalez v. Trevino*, 144 S. Ct. 1663, 1667 (June 20, 2024). For Reynolds to "fall within the exception, [he] must produce evidence to prove that his arrest occurred in such circumstances." *Id.*

The Court first turns to the general rule: whether Reynolds plead and proved the absence of probable cause for his arrest. He does not. Calhoun had arguable probable cause to arrest Reynolds. Reynolds admittedly spoke in a raised tone, in a residential area, late at night—and yelled loudly enough to be heard over 200 feet away. On this evidence, Calhoun could have reasonably believed that Reynolds violated the disorderly conduct statute, even if these circumstances were insufficient to prove an actual violation of § 13-A-11-7(a)(2). *See Brown*, 608 F.3d at 736. Here, the presence of arguable probable cause would ordinarily defeat a retaliatory arrest claim. *See Nieves*, 587 U.S. at 406. Reynolds failed to meet his burden to plead and prove the absence of probable cause. Therefore, unless the *Nieves* exception applies, Calhoun is entitled to qualified immunity because he had arguable probable cause to arrest Reynolds. *See Brown*, 608 F.3d at 734.

The Court finds that the narrow exception the Supreme Court articulated in *Nieves* does not save Reynolds' retaliatory arrest claim. The Court first turns to review Reynolds' evidence, which he argues shows that "he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, U.S. 587 at 407. Second, the Court turns to whether Reynolds' arrest for disorderly conduct

was a "circumstance[] where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id.* at 406.

Reynolds bears the burden to present "objective evidence that he was arrested when otherwise similarly situated individuals *not* engaged in the same sort of protected speech had not been." *Id.* at 407 (emphasis added). Reynolds must "produce evidence to prove that his arrest occurred" in "circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Trevino*, 144 S. Ct. at 1667. Reynolds points to Kimberly, who he claims is a similarly situated individual, as comparator evidence. Kimberly was also present at the scene and was not arrested. Reynolds' briefing on this point is internally inconsistent. First, Reynolds states that Kimberly "did *not* engage in the same sort of protected speech" as Reynolds. (Doc. 62 at 48) (emphasis added). Later, Reynolds states that the *Nieves* exception applies "because a similarly situated person near him [Kimberly] was engaging in the *same* behavior and was not arrested." (*Id.* at 54) (emphasis added).

The Court acknowledges the Supreme Court's recent guidance that "[a]lthough the *Nieves* exception is slim, the demand for virtually identical and identifiable comparators goes too far." *Trevino*, 602 U.S. at 1667. However, even viewing the evidence in the light most favorable to Reynolds, the Court finds that Reynolds fails to carry his burden to point to a comparator sufficient to invoke the slim *Nieves* exception. Reynolds fails to show that Kimberly was engaged in disorderly conduct but not arrested because she was "not engaged" in the "same sort of protected speech" as Reynolds. Indeed, for parts of the interaction with the police, Kimberly and Reynolds both engaged in the same sort of

protected speech—criticizing the police officers' actions.  Therefore, Reynolds has not met his burden to show the *Nieves* exception applies based on his comparator evidence.  Even if the Court considered Kimberly a proper comparator, Reynolds fails to present objective evidence that his arrest qualified as a circumstance where officers have probable cause to make arrests but typically exercise their discretion not to do so.

Here, Calhoun and other officers were forced to make judgments in a "tense, uncertain, and rapidly evolving" situation. *Corbitt*, 929 F.3d at 1321.  The Supreme Court has recognized the "deep-rooted nature of law-enforcement discretion." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 760 (2005).  Thus, officers like Calhoun are entitled to use discretion when making arrests.  "[P]rotected speech is often a 'wholly legitimate consideration' for officers when deciding whether to make an arrest." *Nieves*, 587 U.S. at 401 (citing *Reichle v. Howards*, 566 U.S. 658, 668 (2012)).  Because Calhoun had arguable probable cause to arrest Reynolds, this provides "weighty evidence" that any alleged animus did not cause Reynolds' arrest. *Id.* at 402.

Like Reynolds, the plaintiff in *Nieves* was arrested for disorderly conduct. *Id.* at 396.  In *Nieves*, the Supreme Court did not apply the newly articulated exception to the plaintiff's claims.  Indeed, the Supreme Court did not hold that officers typically do not exercise their discretion to arrest individuals suspected of disorderly conduct. *Id.* at 406–08.  When faced with the opportunity to apply the *Nieves* exception to a suspect arrested for disorderly conduct (the plaintiff in *Nieves*)—the Supreme Court declined.  Although the Supreme Court did not discuss whether officers typically exercise their discretion not to arrest individuals for disorderly conduct—the Supreme Court noted that jaywalking is "endemic

but rarely results in arrest[,]" and if "an individual who has been vocally complaining about police conduct is arrested for jaywalking at such an intersection, it would seem insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest." *Id.* at 407.

Here, Reynolds was arrested for violating Alabama's disorderly conduct statute, making unreasonable noise. *See* Ala. Code § 13A-11-7(a)(2). Unlike jaywalking, an officer making an arrest under Alabama's disorderly conduct statute, could legitimately consider protected speech when making an arrest. *Nieves*, 587 U.S. at 401 (citing *Reichle*, 566 U.S. at 668). Although disorderly conduct is a low-level crime, the record, even when viewed in the light most favorable to Reynolds, supports a finding that Calhoun had arguable probable cause to arrest. Thus, Calhoun's arguable probable cause to arrest suggests that Reynolds was not arrested for exercising his First Amendment rights. *Id.* at 402. Indeed, the Supreme Court in *Nieves* similarly held that the plaintiff's claim could not succeed, "[b]ecause there was probable cause to arrest." *Id.* at 408.

The Court notes that the *Nieves* exception is just that—an exception to the general rule. This exception is "slim" and only applies "where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Trevino*, 144 S. Ct. at 1671. Here, Calhoun had arguable probable cause to arrest Reynolds. Reynolds does not argue that officers typically exercise their discretion not to arrest individuals for disorderly conduct. In *Nieves*, when analyzing a disorderly conduct arrest, the Supreme Court did not apply the newly articulated exception to the general rule that probable cause defeats a

retaliatory arrest claim. Calhoun exercised his discretion to arrest Reynolds, and Reynolds failed to show that the *Nieves* exception applies. Therefore, the Court concludes that Calhoun is entitled to qualified immunity on Reynolds' First Amendment claim.[13]

## VI.  CONCLUSION

For the reasons stated, it is hereby ORDERED as follows:

1.      The Defendants' motion for summary judgment (doc. 53) as to Count One is DENIED as to Woodall and GRANTED as to all other Defendants.

2.      The Defendants' motion for summary judgment (doc. 53) as to Count Five is GRANTED.

3.      The Defendants' motion for summary judgment (doc. 53) as to Count Six is GRANTED.

Done this 13th day of September, 2024.

_____/s/ Emily C. Marks_____
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE

---

[13] Because the Court determines that no constitutional violations occurred, it pretermits discussion regarding whether the law was clearly established.